

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **BOBBY DEAN PREWITT** | § | Case No. 15-60222 |
| xxx-xx-2992 | § | |
| | § | |
| Debtor | § | Chapter 13 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court has heard and considered the First Amended Motion for Valuation filed by 21st Mortgage Corporation (the "Lender") pursuant to 11 U.S.C. §506 and Fed. R. Bankr. P. 3012, and the objection thereto filed by the Debtor, Bobby Dean Prewitt (the "Debtor"), in the above-referenced bankruptcy case. Based upon the Court's consideration of the pleadings, the evidence admitted at the hearing, including all stipulations of the parties, and the argument of counsel, the Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R. Bankr. P. 7052 and 9014.[1]

## *FINDINGS OF FACT*

1.      The Debtor became indebted to the Lender pursuant to a promissory note originally executed to a predecessor-in-interest of the Lender on June 29, 2001.[2]

---

[1] Items identified herein as findings of fact may also be construed to be conclusions of law and are adopted as such. Items identified herein as conclusions of law may also be construed to be findings of fact and are adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

[2] See attachments to proof of claim #3-1.

2.      The indebtedness is secured by a purchase-money security interest in a 2001 Palm Harbor "Country Place" 18' x 76' three-bedroom, two-bath, single-wide manufactured home (the "Collateral").

3.      In part to address an arrearage which had arisen under the Debtor's contract with the Lender, the Debtor filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on April 8, 2015.

4.      The Lender filed a proof of claim on May 13, 2015, asserting a secured value of $31,752.75.[3]

5.      A Chapter 13 plan was confirmed for the Debtor on July 22, 2015, with a final valuation assessment regarding the manufactured home reserved for future determination through various alternatives, including any contested matter "resolving a party's separate motion to value the particular collateral pursuant to 11 USC (sic) 506 and Bankruptcy Rule 3012."[4]

6.      After having filed an original motion for valuation on June 1, 2015, the Lender filed the current amended motion for valuation on July 23, 2015, seeking to establish a valuation of the collateralized manufactured home in an amount "at least $24,104.00."[5]

7.      The Debtor subsequently filed an objection to that asserted value.[6]  The value of the collateralized manufactured home is the sole issue presented to the Court.

8.      The Debtor and the Lender stipulated that the Lender is the current owner and holder of the promissory note obligation owed by the Debtor and that the Lender holds a properly-perfected purchase money security interest in the Collateral.

---

[3] See proof of claim #3-1 which the Lender filed as a wholly secured claim, but with no asserted value of collateral actually given.

[4] See *Order Confirming Chapter 13 Plan and Related Orders* entered on August 11, 2015 [dkt #32] at p. 4.

[5] See *First Amended Motion for Valuation* filed on July 23, 2015 [dkt #30] at p. 2.

[6] Though the Debtor's original Chapter 13 plan reserved the actual valuation determination for a future date, the asserted value of the collateral as set forth in the Debtor's proposed plan, and in the Debtor's original Schedule B was $12,500, as opposed to the $13,898 value ascribed by his expert.

*Lender's valuation testimony*

9.      The Lender offered appraisal testimony of two witnesses in support of its collateral valuation of $24,104.00.

10.     Mr. Hugh Harvey inspected the Collateral on June 8, 2015.  He characterized the condition of the Collateral as "fair."  He acknowledged that there was no structural damage to the Collateral and observed that the only problems were cosmetic in nature.

11.     After inspection of the Collateral, Mr. Harvey prepared a written appraisal report utilizing a NADA-developed format known as the National Appraisal System ("NAS").[7]

12.     As a result, Mr. Harvey's report follows the perfunctory procedures imposed by the NAS format.

13.     Mr. Harvey adjudged the home to be in "fair" condition[8] and increased the value by 3% pursuant to the current location adjustment for units located within the state of Texas.  He made no condition adjustment and reached a Total Adjusted Value of $17,431.56 – which he rounded to $17,400.00.

14.     From there, he made a downward adjustment of $1,050.00 to that base retail value for "cost of repairs" – those costs arising from the need to make actual repairs to the Collateral and not merely to correct appearance depreciation.  His deduction was primarily attributable to one window needing repair.

15.     Mr. Harvey made an upward adjustment of $3,005.00 for "components" – which were primarily derived from depreciated values attributable to carpeting, bathroom fixtures, upgraded kitchen appliances, a washer/dryer system, and an upgraded heating unit.[9]

---

[7]  Lender's Ex. 1.  See Conclusions of Law ¶¶ 19-29.

[8]  A manufactured home is considered in "fair" condition when "minor deterioration [is] apparent due to both the climate and the deferred maintenance," making the home "less attractive but obviously useful."  See N.A.S. "Condition Guidelines" set forth in Lender's Ex. 2 at p. 3.

[9]  "A component is considered to be anything which is built into the manufactured home or added to it in such a way that is becomes an essential part of the home and is built to a state or local code."  *See* N.A.S. General Instructions set forth in Lender's Ex. 2 at p. 3 (capitalization omitted).

-3-

16.     He also added $846.00 for a depreciated "accessory"[10] to the home – a 3.5-ton air conditioning system.

17.     Mr. Harvey made no analysis based upon comparable sales.

18.     Based upon his calculation of all of those component values, Mr. Harvey appraised the estimated market value of the Debtor's manufactured home at $20,200.00.

19.     In addition to that asserted value of the used home and its value-adjusted optional equipment, Mr. Harvey included an additional assessment of $3,904.00 for "delivery and setup of a replacement home" which the Lender claims is necessary to complete the determination of replacement value of a manufactured home.

20.     Such an upward adjustment is not contemplated by the National Appraisal System.

21.     This additional upcharge consisted of: (1) an estimated delivery and setup charge of $1,800.00; (2) an $850.00 charge to connect utilities; (3) an $854.00 charge for underpinning installation; and (4) a $400.00 charge to attach the porch and/or steps.[11]

22.     Mr. Harvey opined that the NAS valuation only contemplated the costs of a manufacturer to a retail lot and that these additional upcharges were necessary in order to cover setup charges which would be charged by a retail dealer.

23.     With that addend, Mr. Harvey thus opined that the replacement value of the Debtor's 2001 manufactured home was $24,104.00.

24.     The Lender also offered the appraisal testimony of Billy J. Pendergraft.

25.     Mr. Pendergraft utilized the same NAS assessment process upon the same manufactured home as Mr. Harvey, but reached a different conclusion.[12]

---

[10]  "An accessory is a feature or item which goes with the home, but is not built-in or permanently attached to the home (e.g., skirting, awnings, porch/decks, etc.) and is built to a state or local code." *Id*.

[11]  Lender's Ex. 1 at pp. 1-3. These charges were based upon Mr. Harvey's estimation that a qualified installer and two helpers would be required to complete these setup services.

[12]  Lender's Ex. 2.

26.     The primary differences between the two NAS assessments brought on behalf of the Lender are as follows:

| Value Component | Harvey | Pendergraft |
|---|---|---|
| Base Value | $16,923 | $17,127 |
| State Location Adjustment | 1.03 | 1.03 |
| Condition Adjustment | (fair) 100% | (good) 99% |
| Running Gear Deductions | none | <$882.50> |
| Cost of Repairs Deduction | <$1,050> | <$3,280> |
| Components Enhancement | +$3,005 | +$4,009 |
| Depreciated Replacement Value | $19,355 | $17,246.50 |
| Accessories | $846 | $1,338 |
| Estimated Market Value | $20,200 | $18,600 |

27.     Mr. Pendergraft found the condition of the Collateral to be "good," rather than "fair,"[13] but then concluded that additional repairs would be required to be made to the Collateral in order to maintain that designated status, including the complete replacement of worn carpet ($1865), a damaged wall panel ($75) and a door he viewed as damaged ($101).

28.     Similar to Mr. Harvey, Mr. Pendergraft offered no comparable sales analysis.

29.     Unlike Mr. Harvey, Mr. Pendergraft made no upward adjustment for delivery and setup costs.

30.     Thus, Mr. Pendergraft's assessment of the replacement value of the 2001 manufactured home was $18,600.00.

---

[13] A manufactured home is considered in "good" condition when "normal wear and tear is visible, but home is well maintained, still attractive, desirable and useful."  See N.A.S. "Condition Guidelines" set forth in Lender's Ex. 2 at p. 3.

*Debtor's valuation testimony*

31.     On the other hand, the Debtor urged the Court to adopt a significantly lower collateral value of $13,898.00 for the manufactured home based upon the appraisal testimony of Ronald L. Jones.

32.     Mr. Jones testified on behalf of the Debtor based upon his experience as a retired branch manager for a national retail financing company and field work for a finance servicing company, which has often involved him in the appraisal of manufactured homes.

33.     Mr. Jones assessed the general condition of the Collateral as "between fair and poor."

34.     In determining a value for the Collateral, Mr. Jones rejected any use of NADA sales information in reaching his opinion because he inexplicably claimed to have no faith in such information.

35.     Thus, Mr. Jones, without any reference to NADA information or its NAS format, engaged in an analysis of comparable sales.

36.     Acknowledging the difficulty of locating sales of 18' single-wide units, Mr. Jones relied upon sales data of four used units in the Tyler area, none of which precisely matched the manufacturer and type of unit constituting the Collateral.

37.     A 2000 Palm Harbor unit provided the highest sales price utilized by Mr. Jones. The only 2001 unit utilized was only a 16' single-wide unit.  The two other sales involved older units on the lower-end of the quality spectrum than the Collateral.[14]

38.     Utilizing a $12.92 per square foot average derived from the sales prices for the four units, Mr. Jones assessed a basic retail value of $17,183.00 for the Collateral.

39.     Mr. Jones inspected the Collateral and expressed greater concern regarding the problems with the unit that Mr. Harvey had characterized as "cosmetic."

40.     From the basic retail value of $17,183.00, Mr. Jones thought a downward adjustment of $3,285.00 was needed for necessary repairs including a complete carpet replacement, together with repairs to walls, windows, cabinets, and flooring

---

[14] Debtor's Ex. 1.

— far more than the one window replacement advocated by Mr. Harvey.

41.   On the basis of that calculation, Mr. Jones thereby opined that the replacement value of the Debtor's 2001 manufactured home was $13,898.00.[15]

42.   Obviously the utility of a comparable sales analysis rests upon how "comparable" the utilized sales actually are.

43.   Three of the four units utilized by Mr. Jones in his analysis involved manufacturers of more modest housing.

44.   The only 2001 unit utilized by Mr. Jones was of smaller size than the Collateral.

45.   The only actual Palm Harbor unit considered by Mr. Jones was the same size as the Collateral, though it was one year older, but it still reflected a value of $13.45 per square foot or $18,400.00 — a valuation significantly closer to Mr. Pendergraft's analysis based primarily on NADA information.

46.   The dissimilarity of the units selected by Mr. Jones for his comparable sales analysis and his unilateral rejection of NADA sales information by which the subjective effect of his particular sales choices might have been moderated lessens the reliability of the conclusions offered by Mr. Jones.

47.   Though neither of the Lender's appraisers utilized any comparable sales analysis, notwithstanding the fact that the NAS procedure suggests that the guide book retail value should be adjusted to reflect local market conditions,[16] the best comparable offered to the Court supports the general conclusions of Mr. Pendergraft.

48.   Upon close examination of the opinions proffered, and the variables relating to each approach, the Court finds that the analysis offered by Mr. Pendergraft is generally more reliable and credible in assessing the value of the referenced Collateral, subject to a slight adjustment based upon the most relevant comparable sale information presented to the Court.

49.   The replacement value of the Debtor's 2001 Palm Harbor "Country Place" 18' x 76' three-bedroom, two-bath, single-wide manufactured home is established as $18,500.00.

---

[15]  *Id.*

[16]  Though such adjustments may be omitted when reliable data is unavailable, no evidence was proffered of any effort by the Lender's appraisers to ascertain the availability of such information.

50.     That replacement value of the Collateral should not be enhanced or supplemented by  hypothetical "delivery and setup" costs that will never be incurred.

51.     To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## *CONCLUSIONS OF LAW*

1.     This Court has jurisdiction to consider the motion for valuation pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a).

2.     The Court has authority to enter a final order in this contested matter since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A), (B), and (O), and arises under §506(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3012.

3.     11 U.S.C. §506(a) provides, in pertinent part:

> (1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest  . . .  is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property  . . .  and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

> (2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

11 U.S.C.A. §506(a) (West Supp. 2014).

4.      Pursuant to Rule 3012 of the Federal Rules of Bankruptcy Procedure:

> The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct.

> FED. R. BANKR. P. 3012

5.      As the movant in this Rule 3012 valuation context, 21st Mortgage has the burden of proof to establish that the valuation asserted in its motion is accurate. *In re Sneijder*, 407 B.R. 46, 55 (Bankr. S.D.N.Y. 2009); *In re Panther Mountain Land Dev., LLC*, 438 B.R. 169, 193 (Bankr. E.D. Ark. 2010); *In re Kelley*, 2015 WL 3952352, at *4 (Bankr. E.D. Cal., June 25, 2015).

*Replacement Value*

6.      For many years, § 506(a) of the Bankruptcy Code did not provide any direction for determining the value of property.

7.      A kernel of guidance was finally provided in *Associates Commercial Corp. v. Rash,* 520 U.S. 953 (1997), in which the United States Supreme Court prescribed that, when a debtor proposes to retain and use particular property in a chapter 13 reorganization case, the valuation of that property must be based upon the "replacement value" of the secured property. *Id*. at 965.

8.      The *Rash* court defined replacement value as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960.

9.      In other words, when a debtor seeks to exercise the "cram down" option under §1325(a)(5)(B), "the value of property retained . . . is the cost the debtor would incur to obtain a like asset for the same proposed . . . use." *Id*. at 965.

10.     However, despite such general guidance, the particular techniques to be utilized to ascertain that replacement value were left to be developed by bankruptcy courts on the basis of the evidence presented in any particular case.

11.     The 2005 adoption of the Bankruptcy Abuse Prevention and Consumer Protection

Act ("BAPCPA") brought a new statutory subsection — § 506(a)(2)[17] — which addresses the valuation of personal property in individual Chapter 7 and Chapter 13 cases.

12. The first sentence of § 506(a)(2) codifies *Rash* in individual chapter 7 and chapter 13 cases by expressly mandating the use of replacement value as the valuation methodology.

13. The second sentence of § 506(a)(2) establishes a statutory definition of replacement value for "property acquired for personal, family, or household purposes," as "the price a retail merchant would charge for property" of the age and condition of the secured property.

14. Yet the Bankruptcy Code still does not impose a specific method for calculating the retail value of an item of personal property.

15. Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties' expert witnesses. *In re Wright*, 460 B.R. 581, 584 (Bankr. E.D.N.Y. 2011); *In re Grind Coffee & Nosh, LLC*, 2011 WL 1301357, at *6 (Bankr. S.D. Miss., Apr. 4, 2011).

16. "The valuation of property is an inexact science and whatever method is used will only be an approximation and variance of opinion by two individuals does not establish a mistake in either." *In re Creekside Sr. Apartments, LP*, 477 B.R. 40, 61 (B.A.P. 6th Cir. 2012) (citing *Boyle v. Wells (In re Gustav Schaefer Co.)*, 103 F.2d 237, 242 (6th Cir.1939)).

17. "In weighing conflicting appraisal testimony, courts generally evaluate a number of factors, including the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented." *Anderson v. Mega Lift Sys., LLC (In re Mega Systems, LLC),* 2007 WL 1643182, at *8 (Bankr. E.D. Tex., June 4, 2007) (*citing In re Smith*, 267 B.R. 568, 572-73 (Bankr. S.D. Ohio 2001)).

18. A bankruptcy court is not bound to accept the values in the parties' appraisals; rather, it may form its own opinion of the value of the subject property after

---

[17] *See supra* Conclusion of Law ¶ 3.

considering all of the evidence presented.  *In re Breakwater Shores Partners, L.P.*, 2012 WL 1155773, at *8 (Bankr. E.D. Tex., Apr. 5, 2012) (*citing In re Holcomb Health Care Servs., L.L.C.,* 329 B.R. 622, 669 (Bankr. M.D. Tenn. 2004)).

*NADA Information for Manufactured Homes*

19.   The two appraisals sponsored by the Lender in this case were based upon a regimen called the National Appraisal System (the "NAS"), which was developed by National Appraisal Guides, Inc., the publishing arm of the National Automobile Dealers Association ("NADA"),  which in previous years had published the *N.A.D.A. Manufactured Housing Appraisal Guide* (the "NADA Guide").

20.   For years, the NADA Guide compiled information of recent retail transactions regarding pre-owned manufactured homes and offered valuation information regarding those units.

21.   The paper publication of the NADA Guide apparently ceased in 2013 as it yielded to an online version, presumably due to ease of use and an updated database offered by an electronic version.

22.   Whether in paper or electronic versions, the NADA Guide offers professional appraisers a sound valuation base from which to assess the value of a particular manufactured home unit.

23.   The NADA Guide seeks to provide a depreciated replacement cost in retail dollars for a mobile home in average condition.  The Guide incorporates market value data into its assigned value.

24.   Using the basic "bluebook"-type value obtained from the NADA database based upon the type of unit, its model year and its regional situs, the NAS format seeks to equip an appraiser to utilize that valuation base to make a more particularized valuation of a manufactured home based upon an actual physical inspection of the unit and comparable sales information in the area.[18]

25.   The NAS process presents a "base structure value" for the unit, which is then adjusted by location and by condition to reach a "total adjusted value."  It then upwardly adjusts the condition-adjusted value for particular components of, and

---

[18]   The NAS worksheet "directs that both the NADA Guide and the sales comparison approach be considered to establish value."  *In re Meredith*, 2013 WL 4602966, at *3 (Bankr. M.D. Pa., Aug. 29, 2013).

accessories to, the specific unit.[19]

26.     Though the use of the basic NADA sales information for a manufactured home is a
        useful starting point for determining the retail merchant value required by
        §506(a)(2), *In re Kollmorgen*, 2012 WL 195200, at \*4 (Bankr. D. Kan. 2012), the
        appraisal process contemplated by the NAS process requires that certain
        adjustments be made to address the specific components contained in the property
        and the specific condition of such property.

27.     As the *Kollmorgen* court noted:

>       An adjustment for the components and accessories that the
>       subject property has is necessary to compare the subject
>       property to the manufactured home valued by the NADA
>       guide (*i.e.*, to compare "apples to apples"). The adjustment
>       for repair costs is an adjustment to the guide value that takes
>       into account the condition of the manufactured home and is
>       also appropriate.

        *Id.*

28.     The product of those adjustments should itself be further adjusted by available
        comparative sales in the general area in order to reflect local market conditions.
        *See In re Meredith*, 2013 WL 4602966, at \*3 (Bankr. M.D. Pa., Aug. 29, 2013).

29.     Thus, assuming that it is used in its entirety by a knowledgeable and diligent
        appraiser, the NAS process to evaluate the retail price of a manufactured home unit
        is consistent with, and conducive to, the determination of the retail merchant value
        required under §506(a)(2).

*Delivery and Setup Costs as Component of Replacement Value*

30.     The Lender has asserted that, in addition to the retail value of the manufactured
        home, that value may be enhanced by an additional assessment for "delivery and
        setup costs."[20]

---

[19]  This appraisal system has been previously criticized for failing to explain why standard metal
roofing and standard aluminum siding commonly utilized in mobile homes are assessed as value-
enhancing components, and not as basic components contemplated by the substantial "base structure
value" given for a unit.

[20]  *See supra* Findings of Fact ¶¶ 19-22.

31. Yet such an artificial enhancement of collateral value cannot be endorsed under the general principles of *Rash* or by the standards of §506(a)(2).

32. The point of the whole valuation process is to ascertain the value of a particular asset in its current condition, and not to re-create all aspects of a hypothetical sales transaction with all of its ancillary activities.

33. *Rash* instructed us that replacement value should not include "the value of items the debtor does not receive" when retaining property.[21]  *Rash*, 520 U.S. at 965 n. 6.

34. Since the Debtor's manufactured home is being retained and not actually being replaced, the exclusion of these ancillary items is consistent with *Rash*'s directive of determining replacement value under §506 only in light of the proposed disposition or use  — not alternatives that have not actually been proposed.  *See Rash*, 520 U.S. at 965 n. 2 ["By using the term 'replacement value,' we do not suggest that a creditor is entitled to recover what it would cost the debtor to purchase the collateral brand new."].

35. This principle is maintained in §506(a)(2) in which replacement value of collateral securing a consumer debt is defined as the price a retail merchant would charge for the property itself — not for tangential services that will not be actually performed.

36. As one court has recently observed, "[f]or the same reasons debtors cannot deduct repossession/relocation costs from value, creditors cannot add delivery and set up costs to the value of their collateral.  If value were added for moving costs, the increase would be based on a hypothetical replacement 'that will not take place.'" *In re Gensler*, 2015 WL 6443513, at *3 (Bankr. D.N.M., Oct. 23, 2015) (citing *Rash*, 520 U.S. at 963).

37. The Lender's asserted costs for delivery and setup, utility connection, and porch attachment are completely illusory and artificial.

38. They reflect services that this debtor will not actually receive and costs that this Lender will not actually incur.  These are, in fact, costs for which the debtor has already paid and which will not, in reality, be repeated.

---

[21]  In the context of *Rash*, in which an automobile was being retained, the Supreme Court directed that ancillary items such as warranties, inventory storage, and reconditioning costs should be excluded.

-13-

39.   The rejection of such chimerical charges merely reflects the directive that it is the charge for the *property* – in its current condition and with its current components – that is to be determined in the search for replacement value.

40.   Accordingly, the Lender's request that the replacement value of the Debtor's manufactured home be supplemented by hypothetical delivery and setup costs must be denied. *Gensler*, 2015 WL 6443513, at *4 [concluding that "when the proposed disposition is to keep a mobile home at its current location, *Rash*'s rationale indicates that all moving costs, whether increasing or reducing value, should be disregarded"].

41.   Therefore, based upon the evidence presented and for the reasons set forth herein, the Court concludes that the First Amended Motion for Valuation filed by 21st Mortgage Corporation is granted in part and denied in part and that the replacement value of the Debtor's 2001 Palm Harbor "Country Place" 18' x 76' three-bedroom, two-bath, single-wide manufactured home is established as $18,500.00.

42.   All other relief requested in the motion for valuation is denied.

43.   To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

44.   An appropriate order shall be entered in this bankruptcy case consistent with these findings and conclusions.


Signed on 12/08/2015


_____
THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE


**-14-**